[909 NYS2d 618]

THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, v STEVE DOR-
CENT, Defendant.

Criminal Court of the City of New York, Kings County, October 22, 2010

**APPEARANCES OF COUNSEL**

*Charles J. Hynes, District Attorney,* Brooklyn (*Brandon Smith* of counsel), for plaintiff. *Legal Aid Society,* Brooklyn (*David Werber* of counsel), for defendant.

## OPINION OF THE COURT

ALEX M. CALABRESE, J.

Defendant was charged before this court with violating Vehicle and Traffic Law § 511 (1) (a), for allegedly driving with a license that was suspended multiple times on two different dates. Several months prior, in a different court, he pleaded guilty to violating Vehicle and Traffic Law § 1192 (1), driving while his ability was impaired by alcohol.

In this case, pursuant to a plea agreement, defendant entered an "open plea" to Vehicle and Traffic Law § 511 (1) (a) and § 509 (1). While pending sentence, defendant agreed not to break the law, to clear his license with the Department of Motor Vehicles and not to consume alcohol for a period of 30 days. His abstinence would be monitored by the secure continuous remote alcohol monitoring (SCRAM) bracelet, to be worn on his ankle. Upon successful completion of the conditions, he would receive a sentence of a $300 fine on Vehicle and Traffic Law § 509 (1), and the higher charge of Vehicle and Traffic Law § 511 (1) (a) would be dismissed.

Three weeks after entering his plea, personnel monitoring the SCRAM bracelet reported that the bracelet was unable to monitor the defendant's alcohol consumption for a 10-hour period due to an alleged obstruction preventing the device from gathering data. The People requested that the court consider this a violation of the defendant's plea agreement. The defendant denied tampering with the device. A hearing was held on the issue of whether the defendant violated the terms of his plea agreement.

## Issues Presented

Is SCRAM technology sufficiently reliable scientific evidence to satisfy the *Frye* test for admissibility of scientific evidence in New York State?[1] If so, did the People in this case meet their burden of proving that the defendant intentionally obstructed the SCRAM device in violation of his plea agreement?

## Findings of Fact

At the hearing, the People called Amanda Spears, an employee of Rocky Mountain Offender Monitoring Systems (RMOMS), the agency responsible for purchasing, installing and monitoring the SCRAM bracelet and explaining its terms of use to the

---

1. *Frye v United States*, 293 F 1013, 1014 (DC Cir 1923).

defendant. She testified that pursuant to his plea agreement, she met with the defendant and fitted him with a SCRAM bracelet on April 21, 2008. At that meeting, defendant was informed of the requirements of the program and given specific instructions for the care of the bracelet.[2] Ms. Spears discussed obstruction and tampering prohibitions, explained the SCRAM agreement and client policy, asked the defendant to initial each section and provided the defendant with a copy of each document.

She testified further that between April 21 and May 10, the monitoring company identified some short-term obstructions that did not rise to the level of what it considered to be a violation or require reporting. She discussed those incidents with the defendant, but believed he was complying with the terms of the SCRAM agreement at that time.

The People also called Jeff Hawthorne, co-founder and chief technology officer of Alcohol Monitoring Systems (AMS) and a co-inventor of SCRAM, as an expert. With the aid of a Power-Point presentation, Mr. Hawthorne attempted to lay the foundation for the admission of SCRAM evidence by describing SCRAM technology, its acceptance by the scientific community and its use by criminal justice agencies.

He testified that he reviewed the data received from defendant's SCRAM bracelet for May 11 and determined that defendant's SCRAM bracelet was unable to detect the defendant's transdermal alcohol concentration (TAC) from 8:12 A.M. to 6:21 P.M., a period of 10 hours and 9 minutes. During that time, the SCRAM device showed a reading of 2.067 volts, considered above the program's allowable range and indicative of an obstruction between the infrared signal of the SCRAM device and defendant's skin. AMS considered this to be a violation and prepared a report. Defendant's alcohol concentration readings earlier that morning, from 2:00 A.M. to 4:00 A.M., indicated a slight increase in the defendant's TAC. As this increase did not rise above .02%, it was not considered a violation of the SCRAM program.[3]

---

2. Defendant agreed to abide by the terms of the SCRAM participation agreement, including agreeing to abstain from all alcohol consumption, to avoid all products containing alcohol and to avoid restricted activities. The agreement specified that failure to comply with any of its terms would be considered a violation of the agreement and may result in adverse consequences on his criminal case.

3. Jeff Hawthorne testified at the hearing that the SCRAM device would have to register three consecutive .02% TAC readings for AMS to flag it as a

The People introduced six documents into evidence: defendant's SCRAM program participant agreement (SCRAM agreement), RMOMS SCRAM program client policy, a scientific study titled *Validity of Transdermal Alcohol Monitoring: Fixed and Self-Regulated Dosing* by Joseph T. Sakai et al. (Sakai study),[4] a printout of AMS's PowerPoint presentation explaining the functionality of the SCRAM bracelet, a 2007 Final Report from the National Highway Traffic Safety Administration, titled Evaluating Transdermal Alcohol Measuring Devices (NHTSA report),[5] and the SCRAM System Data Interpretation prepared for RMOMS by AMS, confirming the defendant's bracelet obstruction (violation report).

Defendant testified and denied tampering with the device at any time. He testified that he was at work at the time the alleged obstruction occurred. In support of this contention, he submitted his employee time sheet for the week of May 11, indicating that he worked from 7:30 A.M. to 4:30 P.M., with a lunch break from 1:00 P.M. to 2:00 P.M., on the day in question. He entered two additional documents into evidence: an article by the Honorable Dennis N. Powers and Daniel Glad, titled *The SCRAM Tether as Seen Through the Eyes of Davis-Frye and Daubert,*[6] analyzing the SCRAM bracelet and an article by the National Association for Criminal Defense Lawyers, titled *Alcohol Monitoring Ankle Bracelets: Junk Science or Important Scientific Breakthrough?*[7]

## Conclusions of Law

In determining whether SCRAM evidence is sufficiently reliable for admission under *Frye*, the court needs to consider: (1) the science behind SCRAM; (2) SCRAM procedure and technology; (3) New York evidentiary requirements; (4) the development and acceptance of SCRAM by the scientific community; (5) the reliability and judicial acceptance of SCRAM; and (6) the SCRAM procedure followed in this case.

---

drinking episode. He stated further that a person would have to consume approximately two drinks per hour to attain one .02% TAC reading.

4. Joseph T. Sakai et al., *Validity of Transdermal Alcohol Monitoring: Fixed and Self-Regulated Dosing*, 30 Alcoholism: Clinical & Experimental Res [No. 1] 26 (2006).

5. Paul Marques and A. Scott McKnight, Evaluating Transdermal Alcohol Measuring Devices, National Highway Traffic Safety Administration (2007).

6. Dennis N. Powers and Daniel Glad, *The SCRAM Tether as Seen Through the Eyes of Davis-Frye and Daubert*, 85 Mich BJ 35 (June 2006).

7. Patrick T. Barone, *Alcohol Monitoring Ankle Bracelets: Junk Science or Important Scientific Breakthrough?*, 29 Champion 41 (NACDL May 2005).

### 1. The Science Behind SCRAM

When alcohol is consumed, a portion of it is digested in the stomach, while the majority of it passes through the small intestine. It is absorbed by the small intestine, passes through the liver, enters the bloodstream and is circulated throughout the body. A small portion of the alcohol gets transferred to the water components of the skin. This process allows alcohol to be detected in the blood, breath, urine and sweat.

Courts throughout the United States routinely admit evidence of blood alcohol content derived from blood, breath and urine tests. In recent years, technology that measures the elimination of alcohol through the skin through perspiration, "transdermal excretion of alcohol," is being utilized by criminal justice agencies, such as departments of probation and parole, as part of the resolution of criminal court cases. AMS contends that their SCRAM device is able to determine transdermal alcohol concentration, nonintrusively, 24 hours a day, seven days a week for the entire supervision period set by the court.

Since it takes much longer for alcohol to be processed and eliminated through the skin, alcohol consumption takes longer to register by TAC than blood and breath tests. TAC does not quantify the amount of alcohol consumed, but can identify whether a small, moderate or large amount was used, as well as show the length of time the drinking event lasted. TAC levels tend to be lower than blood alcohol concentration and continue to register alcohol long after breath and blood tests would.

### 2. SCRAM Procedure and Technology

Secure continuous remote alcohol monitoring is an automated alcohol monitoring system that uses transdermal testing to measure alcohol consumption. The SCRAM system has three components, the SCRAM bracelet, the SCRAM modem and SCRAMnet.

The SCRAM bracelet is an eight-ounce device, approximately the size of a deck of cards, that attaches securely around a person's ankle, leaving approximately one-half inch of space. It is designed to be worn around-the-clock. The bracelet has a collection chamber and fuel cell, which tests the vapors in a person's perspiration at reoccurring times throughout the day and night. It also has a tamper strap and securing clip that prevents the wearer from removing the device and a temperature sensor and an infrared (IR) sensor to detect obstructions. The IR sensor sends an IR beam between the bracelet and the

leg. The reflection of the beam is measured in volts. Alcohol readings, tamper alerts, body temperature and diagnostic data are transmitted to a modem inside the subject's home at least once every 24 hours and then to SCRAMnet via an Internet connection for analysis, monitoring and storage.

AMS analyzes the alcohol data received and compares it against known blood alcohol content curves for absorption, concentration and elimination of alcohol. To avoid false positives, AMS disregards readings that are too low to suggest alcohol use or that show a sharp short-term spike, which is more indicative of an interferant. Only when TAC levels are elevated above .02% for three consecutive readings does AMS confirm an alcohol event. According to AMS, to reach a .02% TAC, the participant would have had to consume approximately two drinks per hour.

To detect tampering or an obstruction, a baseline voltage is established when the SCRAM bracelet is first fitted on a subject, and AMS sets the allowable range, called a "sleeve," of 12% upwards and 17% downwards from the base line. The wearer must maintain voltage readings at the base line or within the sleeve percentages. When the voltage is outside the acceptable range for a period of eight hours or longer, it is considered a violation and is reviewed by AMS technicians.[8]

Different obstructions create discernable patterns which help the AMS technicians determine the substance inserted between the leg and the device. For example, AMS has tested and has determined the pattern created by a wet paper towel, socks, aluminum foil, and lunch meats. An item like aluminum foil, which is reflective, creates a pattern with several high peaks, while items like paper towels and socks create a more level pattern, similar to a plateau.

AMS technicians routinely analyze the data collected. If alcohol consumption or the use of an interferant is suspected it is investigated and submitted to a review committee within AMS which includes Jeff Hawthorne, the director of customer service and the vice-president of engineering. If this committee confirms that a violation has occurred, it prepares and sends a report to the compliance agency.

---

8. AMS sets an eight-hour minimum time period for an interferant violation to be reported to allow the participant some time for an innocent violation that may block the signal for a short time. However, any blockage in excess of eight hours may be an attempt to conceal a drinking event, which usually lasts an average of 10 to 12 hours.

### 3. New York Evidentiary Requirements

Scientific evidence can only be admitted in New York if it is relevant to an issue in the case, beyond the knowledge of the average juror, proffered by a qualified expert and generally accepted as reliable by the scientific community.[9]

█ SCRAM technology is relevant to the issue at hand and is clearly beyond the knowledge of the average juror. Analysis of the SCRAM data is essential evidence in the court's decision as to whether the defendant intentionally tampered with the device and thus violated the conditions of his open plea. The technology of the SCRAM device requires expert knowledge to explain how it functions, how the TAC is obtained, how data is stored, and how to interpret the meaning of that data.

Here, the People offered Jeff Hawthorne as an expert on the SCRAM device and technology. Mr. Hawthorne has a Bachelor's degree in electrical engineering, began working with hand-held breath testing equipment in 1986 and co-invented the SCRAM device in 1991. He is the co-founder and chief technology officer of AMS, the company responsible for manufacturing and distributing the SCRAM device and reviewing the SCRAM data and has previously been admitted as an expert witness on the device in approximately 47 other states. Clearly his qualifications merit his admission as an expert in this matter, with the caveat that, as an employee of the company, he is interested in the outcome of the case.

The evidence is relevant, beyond the knowledge of the average juror and was presented by a qualified expert. The final requirement for admission of SCRAM technology in New York State is the SCRAM device's reliability and general acceptance by the scientific community.

### 4. The Development and Acceptance of SCRAM by the Scientific Community

The principle of transdermal transport, which allows chemicals to be transported across unbroken skin is used in common marketplace items such as patches for nicotine, birth control, and sea sickness, as well as muscle relaxants, chest pain medication and blood pressure drugs.[10]

---

9. *See Frye*, 293 F at 1014; *People v LeGrand*, 8 NY3d 449, 457-458 (2007); *People v Wesley*, 83 NY2d 417, 429 (1994).

10. Exhibit 4 in evidence, PowerPoint printout of SCRAM technology prepared by AMS and used by Jeff Hawthorne as he testified at the hearing; *see also State v Lemler*, 774 NW2d 272, 282 (SD 2009).

In 1930, scientists began collecting perspiration excreted from the skin to detect alcohol.[11] Shortly thereafter, a sweat patch that attached to a subject's skin for several days was developed and clinically studied.[12] Since that time, numerous articles published in scientific journals have concluded that alcohol concentration levels detected in perspiration show a measurable relationship to the concentration of alcohol in blood and breath tests and TAC does not produce any false negatives.[13]

The other components of SCRAM utilize widespread commercially accepted technology. The fuel cell technology present in the device is identical to that used in many breath-testing instruments and preliminary breath-testing devices.[14] Similar technology is currently utilized in approximately 50,000 alcohol sensors worldwide, across five continents.[15]

SCRAM's infrared technology, used to detect obstructions by examining the reflection created, has been in existence for decades and is commonly used in cameras, copy machines, secu-

---

**11.** E. Nyman and A. Palmlov, *The Elimination of Ethyl Alcohol in Sweat*, 74 Scandinavian Archives of Physiology 155 (1936); S.W. Bruisilow and E.H. Gordes, *The Permeability of the Sweat Gland to Nonelectrolytes*, 112 Am J of Diseases in Child 328 (1966); G.L.S. Pawan and K. Grice, *Distribution of Alcohol in Urine and Sweat After Drinking*, 292 Lancet (Issue 7576) 1016 (1968); H.L. Johnson and H.I. Maiback, *Drug Excretion in Human Eccrine Sweat*, 56 J of Investigative Dermatology 182 (1971); R.J. Scheuplein, *Permeability of the Skin: A Review of Major Concepts*, 7 Current Probs in Dermatology 172 (1978), as cited in Robyn Robertson, Ward Vanlaar and Herb Simpson, Continuous Transdermal Alcohol Monitoring: A Primer For Criminal Justice Professionals (2007).

**12.** M. Phillips and M. McAloon, *A Sweat-Patch Test for Alcohol Consumption: Evaluation in Continuous and Episodic Drinkers*, 4 Alcoholism: Clinical & Experimental Res (No. 4) 391 (1980); M. Phillips, *An Improved Adhesive Patch for Long-Term Collection of Sweat*, 8 Biomaterials, Med Devices & Artificial Organs (No. 1) 13 (1980); M. Phillips, *Sweat-Patch Test for Alcohol Consumption: Rapid Assay With an Electrochemical Detector*, 6 Alcoholism: Clinical and Experimental Res (No. 4) 532 (1982), as cited in Victor E. Flango and Fred L. Cheesman, *Effectiveness of the SCRAM Alcohol Monitoring Device: A Preliminary Test*, VI Drug Ct Rev (No. 2) 109 (2009).

**13.** *Id.*; J.R. Zettl, The Determination of Blood Alcohol Concentration by Transdermal Measurement (unpublished 2002); R.M. Swift, *Transdermal Measurement of Alcohol Consumption*, 88 Addiction 1037 (1993); R.M. Swift, *Transdermal Alcohol Measurement for Estimation of Blood Alcohol Concentration*, 24 Alcoholism: Clinical & Experimental Res (No. 4) 422 (2000); Robertson, note 11 herein; Flango, note 12 herein; Jeffrey S. Hawthorne and Mark H. Wojcik, *Transdermal Alcohol Measurement: A Review of the Literature*, 39 Canadian Soc'y of Forensic Sci J (No. 2) 65 (2004).

**14.** *See* note 10 herein, exhibit 4, SCRAM Usage.

**15.** *Id.*; *see also Lemler*, 774 NW2d at 282.

rity equipment and electronic monitoring devices.[16] It is a standard technology, generally considered to be reliable.[17]

Clearly, each individual component of SCRAM has been accepted by the scientific community as well as the commercial marketplace.

Furthermore, scientific studies such as the Sakai study and the NHTSA report, submitted by the People, support the accuracy of the SCRAM device. The Sakai study concluded that the device is reliable and valid, while the NHTSA study reported that the SCRAM device detected 88% of the subject's drinking events and did not have any false reports. The NHTSA report found that SCRAM's IR technology was effective in identifying obstructions when the device was intentionally blocked by a defendant from producing any readings.

In 2009, the Pacific Institute for Research and Evaluation in Calverton, Maryland published its findings after conducting a 96-week trial with 22 paid research assistants who wore either a SCRAM device or another device (the Giner WrisTAS) that utilized the same TAC technology. They concluded that both devices were able to detect alcohol at the skin surface; neither device registered false positives; and the SCRAM device was more reliable.[18]

In another study, AMS conducted a trial with 10 people over 30 days. Participants agreed to wear the SCRAM device while going about their normal activity but were required to log any alcoholic beverages consumed. AMS then compared its data with the logs the participants prepared. Mr. Hawthorne reported that AMS was able to identify only 30% of the participants who reported having one drink, 41% of the participants who reported two drinks at a time, 65% of the participants who reported three drinks, 90% of the participants who reported having four or five drinks and 100% of the participants who reported six drinks or more.

---

16. *See* note 10 herein, exhibit 4, SCRAM Usage.

17. *Id.*

18. P.R. Marques and A.S. McKnight, *Field and Laboratory Alcohol Detection with Two Types of Transdermal Devices*, 33 Alcoholism, Clinical & Experimental Res (No. 4) 703 (2009); *see also* Michael J. Buono, *Sweat Ethanol Concentrations are Highly Correlated with Co-Existing Blood Values in Humans*, 84 Experimental Physiology 401 (1999); Alan R. McKelvie, *An Implementation of Remote Alcohol Monitoring in Alaska*, Alaska Justice Statistical Analysis Center (Univ of Alaska Anchorage), available at http://justice.uaa.alaska.edu/research/2000/0410scram/0410.scram.html (last visited Oct. 18, 2010).

AMS, by its own admission, only detects and reports violations for drinking episodes when the wearer has in excess of two drinks in an hour or an interferant when the signal had been blocked for eight hours or more. It is therefore reasonable to conclude that AMS allows a wearer every reasonable inference of innocence.

## 5. Reliability and Judicial Acceptance of SCRAM

SCRAM is currently used in 46 states and 1,900 jurisdictions.[19] As of 2007, SCRAM evidence was found to be reliable and admitted in 49 hearings throughout the United States.[20] According to Mr. Hawthorne, as of March of 2009, SCRAM had been used to perform 254,755,986 alcohol tests on 93,463 individuals over 7,995,962 days.[21]

Last year, two courts considered the admissibility of the SCRAM device under the federal standard.[22] Those courts reviewed and considered the same articles, studies and publications presented to this court and found that the technology had been or could be tested, the process was subject to review and publication, the process had potential error rates lower than some other accepted methods of measuring alcohol consumption and that it has been accepted within the relevant scientific community.[23] They concluded that the technology was reliable and generally accepted in the commercial marketplace.

█ Although the federal standard is more flexible than the *Frye* standard used in New York, the reasoning used in determining the admission of SCRAM in other jurisdictions is persuasive.[24] This court finds that the SCRAM device and technology is sufficiently reliable and generally accepted in the scientific community and satisfies the *Frye* standard for admission of evidence under New York law.

---

**19.** *See* note 10 herein.

**20.** Robyn Robertson, Ward Vanlaar and Herb Simpson, Continuous Transdermal Alcohol Monitoring: A Primer for Criminal Justice Professionals, at 21 (2007).

**21.** *See* note 10 herein.

**22.** Fed Rules Evid rule 702; *see also Daubert v Merrell Dow Pharmaceuticals, Inc.*, 509 US 579 (1993).

**23.** *See Mogg v State*, 918 NE2d 750 (Ind Ct App 2009); *Lemler*, 774 NW2d at 272. In both matters, Mr. Hawthorne, the same expert as herein, testified and was accepted as an expert in the field.

**24.** The federal standard outlined by *Daubert* requires a finding that there is widespread acceptance in the *relevant* scientific community, while the *Frye* standard requires general acceptance by the scientific community.

## 6. SCRAM Procedure Followed in This Case

As the Court of Appeals set forth in *People v Wesley*, "[o]nce *Frye* has been satisfied, the question is whether the accepted techniques were employed by the experts in this case. The focus moves from the general reliability concerns of *Frye* to the specific reliability of the procedures followed."[25]

Here, the People introduced testimony explaining how the device was fitted specifically to the defendant, how the base line was adjusted to conform to the defendant's specific characteristics and how the defendant was instructed on the proper care of the bracelet. Defendant was warned about placing items between his leg and the device and specifically told to fold his socks beneath the device to avoid any interference with the signal. Defendant acknowledged receiving these instructions both orally and in writing.

The AMS technicians followed a very careful procedure prior to reporting a blockage violation. When defendant's IR levels were outside the proper range for a consecutive eight-hour period, the data was reviewed, investigated, and then sent to the committee for confirmation. Since this was a clear violation, there was no need for AMS to take additional steps to request that RMOMS, the service provider, interview the defendant or inspect the device. Furthermore, since defendant did not claim any interference and since no alcohol use was specifically reported, there was no need for AMS to further investigate or test. This eight-hour minimum time period and the series of internal reviews exist to give the wearer the benefit of the doubt and to eliminate any false positive reports.

The People established that RMOMS and AMS followed specific procedures to fit, adjust and monitor the defendant's SCRAM bracelet. The court finds that this procedure ensured the reliability of the data collected and served as a proper foundation for AMS to find and report that defendant violated the terms of the SCRAM agreement.

██ Having now concluded that the People have satisfied the general requirements of *Frye* for admissibility of the SCRAM device, as well as established that the procedures followed in this case were reliable, the data collected and the subsequent violation report are admissible in evidence.

---

**25.** *Wesley*, 83 NY2d at 429 (citation and internal quotation marks omitted).

## Violation of Conditional Plea

██ The second issue presented is whether the People met their burden of proving a violation by the defendant in this case. The court has reviewed the testimony and the other evidence introduced in this matter and concludes that an obstruction between defendant's leg and the SCRAM bracelet on May 11 prevented the device from reading defendant's TAC from 8:12 A.M. to 6:21 P.M. Readings from this time period would have been important for the court to determine if the defendant consumed alcohol earlier that morning, when his TAC levels were elevated.

A SCRAM violation is reported only after a continuous blockage for eight hours or more. Consequently, when a blockage is reported, without a satisfactory explanation from the wearer, it is reasonable to conclude that a defendant intentionally blocked the device. This blockage was a violation of his plea agreement to comply with the terms of the SCRAM agreement.

Since the People have proved by a preponderance of the evidence[26] that the defendant violated the terms of his open plea, the charge of Vehicle and Traffic Law § 511 (1) (a) is therefore retained and the case is adjourned for sentencing.

---

**26.** No standard is specified by statute for a violation of a conditional plea. However, CPL 410.70 applies a preponderance of the evidence standard of proof to hearings to determine violations of conditional discharge, probation and parole.