#30764-r-MES
**2026 S.D. 6**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellant,

v.

TIMOTHY HUANTE,                           Defendant and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE MATTHEW M. BROWN
Judge

* * * *

MARTY J. JACKLEY
Attorney General

ERIN E. HANDKE
Assistant Attorney General
Pierre, South Dakota                      Attorneys for plaintiff and
                                          appellant.


GREGORY SPERLICH
ANGELA COLBATH
KYLE BEAUCHAMP of
Colbath & Sperlich Law Office
Rapid City, South Dakota                  Attorneys for defendant and
                                          appellee.

* * * *

ARGUED
MARCH 26, 2025
REASSIGNED
SEPTEMBER 4, 2025
OPINION FILED **02/04/26**

#30764

SALTER, Justice (on reassignment).

[¶1.] Timothy Huante was charged with first-degree murder following the fatal shooting of Dallas Quick Bear. Huante confessed to killing Quick Bear during an interview with law enforcement officers and later disclosed Dr. Stephen Manlove as an expert witness on false confessions. The circuit court denied the State's request to exclude Dr. Manlove's testimony, but it imposed significant restrictions that are not challenged by Huante on appeal. We granted the State's petition for intermediate appeal and now reverse the court's order allowing Dr. Manlove's testimony.

## Factual and Procedural Background

### *The murder investigation and Huante's statements*

[¶2.] Dallas Quick Bear was shot and killed at a Rapid City bar known as Teddy's shortly after midnight on February 20, 2022. Police officers quickly responded to find a mortally wounded Quick Bear who appeared to have been shot in the back of the neck—a conclusion later confirmed by a forensic pathologist. Despite interviewing a number of people who had been in the area of the shooting, officers could not immediately identify a suspect and were unable to develop a consistent description of the shooter.

[¶3.] Later that morning, Huante came to the police station voluntarily and reported that he had been at Teddy's at the time of the shooting. As related in a later probable cause affidavit, Huante "remembered having a gun in his possession" and "was worried that he had done something bad." During an interview with detectives, Huante stated that he could not remember many other details, though

-1-

he denied knowing Quick Bear or being directly involved in his murder. Huante left the police station, and detectives continued their investigation.

[¶4.] The record is not precise, but at some point, over the course of the next day or two, police recovered a black snub-nose revolver from "the lift gate of a delivery truck" parked at a business near Teddy's. Surveillance footage from the business showed Huante placing the gun on the truck's lift gate. Detectives also viewed surveillance footage from in and around Teddy's. Although the bar did not have an operating surveillance camera in the area where Quick Bear was shot, detectives were able to identify footage from other cameras that showed Huante inside Teddy's in the general area of the shooting wearing a white shirt and flat-brimmed hat, both of which were later recovered lying in the snow outside of a nearby gas station.

[¶5.] Huante again met with detectives on February 22, 2022. After he was shown still images of the video footage, Huante confirmed that he was the individual in the images. But he continued to deny any involvement in the shooting.

[¶6.] The next day, Huante voluntarily submitted to a polygraph examination conducted by Detective Elliot Harding, who concluded that the polygraph results showed signs of deception. Detective Harding shared this with Detective Andrew Randazzo, and the two detectives informed Huante of the polygraph examination results and then conducted a third interview.

[¶7.] Detective Harding told Huante, "You did not pass your polygraph . . . . That means that I know that you know that you did shoot that guy." Huante

responded, "I didn't shoot anyone." Huante continued to assert that he could not remember many details of the night of the shooting, but he also persisted in denying any responsibility for Quick Bear's murder. Detective Randazzo told Huante, "We know a lot more about this than we've told you" and "We know what you did."

[¶8.] As the interview progressed, the detectives shifted their interview focus from asking whether Huante was the shooter to talking about why the shooting happened. The detectives hypothesized various reasons why Huante may have committed the crime—each of which Huante denied. Huante's recollection of the events eventually changed:

| | |
|---|---|
| **Huante:** | I didn't shoot him. I didn't shoot him. I don't think I shot him. Did I shoot him? |
| **Det. Randazzo:** | The polygraph told us that you know you shot him. |
| **Huante:** | I f***ing shot him. |

[¶9.] Huante then provided more details about his time in the bar. He explained that the people he went to the bar with told him that Quick Bear "needed to go," though he did not know why. Huante then described how he approached Quick Bear's left side and shot him under the chin. Detective Randazzo instructed Huante to reenact what happened. Huante stood up, walked to the other side of the interview room, approached Detective Randazzo's left side, and pointed his finger underneath Detective Randazzo's chin.

[¶10.] The detectives arrested Huante at the conclusion of the interview and spoke to him again the following day while he was being held in jail. Huante did

not recant or amend any of his statements from the post-polygraph interview conducted the previous day.

[¶11.] A Pennington County grand jury returned an indictment charging Huante with first-degree murder in violation of SDCL 22-16-4(1). In August 2022, Huante's attorney moved to suppress the statements Huante made to the detectives after his polygraph examination, arguing that his statements were coerced and therefore involuntary.

***The motion to suppress based on a coercion and false confession theory***

[¶12.] Detectives Harding and Randazzo both testified at the suppression hearing, and both were asked by defense counsel about an interview method known as the Reid Technique. In the context of his questions, defense counsel suggested that the Reid Technique taught detectives to "confront the subject with what you believe happened." Detective Harding agreed and acknowledged that his statement to Huante that "you didn't pass your polygraph so I know that you shot that man" was consistent with the Reid Technique. Regarding false confessions, Detective Harding acknowledged their existence—"I know they're out there"—though he did not accept defense counsel's suggestion that particular responses to certain polygraph questions could create them.

[¶13.] Defense counsel also addressed the Reid Technique and the topic of false confessions during Detective Randazzo's cross-examination:

> **Defense counsel:** One of the dangers of the Reid method is that it has a danger, the propensity, to induce a false confession; isn't that right?
>
> **Det. Randazzo:** That would be your opinion, that's not mine.

**Defense counsel:** You are not aware that the Reid method has fallen into disfavor?

**Det. Randazzo:** I'm not.

* * *

**Defense counsel:** Have you ever heard of people calling in confessing to crimes they couldn't have possibly committed?

**Det. Randazzo:** Yes.

**Defense counsel:** All right. And it's a concern among law enforcement; right.

**Det. Randazzo:** Yes.

[¶14.] At the conclusion of the suppression hearing, the circuit court clarified Huante's basis to exclude the statements he made during the post-polygraph interview and during the jail interview the following day. Defense counsel described the grounds in terms of a false confession theory and alluded to a forthcoming report from Dr. Manlove:

> I believe that the third, post-polygraph interview, and the fourth, the jail interview, are what are termed false confessions in that he has made statements that don't match the facts as understood by law enforcement, and perhaps the State, and he has adopted facts that have been provided to him by law enforcement, *which dovetails with the work Dr. Manlove is doing, and hopefully we'll have a report at some point.*

(Emphasis added.)

[¶15.] The circuit court pressed further to make sure that the basis of the motion was founded upon a coercion theory:

> **The court:** And . . . the reason I used the term improper coercion is because that's what's in the motion.

**Defense counsel:** Right.

[¶16.] Later, in a written decision, the circuit court denied Huante's motion to suppress. The court indicated that it "disagree[d]" with Huante's argument that his statements during and after the polygraph examination "were the result of improper coercion which rendered the statements involuntary." In this regard, the court found that Huante "corrected Randazzo when he disagreed with Randazzo's statements. Huante was never threatened, nor did law enforcement make him an[y] promises. He was never told that law enforcement would or would not do something based on his cooperation."

### *Dr. Manlove's false confession/coercion opinions and the Daubert hearing*

[¶17.] As noted above, at the time of the suppression hearing, the parties and circuit court all understood that Dr. Manlove's report was imminent. Dr. Manlove is a forensic psychiatrist, and in the report that ultimately followed, he identified four broad issues that Huante's defense team had referred to him:

1. False confessions in general: their prevalence, that they are counter-intuitive [sic] and that subsequent DNA exonerations have revealed their existence.

2. That certain interrogation tactics are more likely to lead to false confessions: i.e., the Reid Technique which can include contamination (the police present non-public information to a suspect and the suspect later incorporates that information into their confession) and the police claiming or suggesting that they have more evidence than they do.

3. Certain persons are more likely to be susceptible to making false confessions, and

4. The hallmarks of a false confession. The suspect's description doesn't match other facts or is impossible in light of known facts.

[¶18.]     As to the first area, Dr. Manlove stated that false confessions do exist, principally relying upon the fact that some prisoners who were later exonerated of their crimes through DNA testing had made confessions. He noted a number of statistics in an effort to quantify the scale of false confessions, most of which he had taken from a website called falseconfessions.org. Dr. Manlove could not identify who was funding or compiling the information on this website, nor could he verify the reliability or validity of any of the statistics presented.

[¶19.]     For the second and third referred questions, Dr. Manlove offered his opinion that certain methods of police questioning, like the Reid Technique, are "more likely" to lead to false confessions. This, he said, was particularly true for a person like Huante, but not because Huante was somehow predisposed to suggestion. Rather, Dr. Manlove's opinion was that Huante was more likely to provide a false confession under questioning adhering to the Reid Technique because he said he did not remember many details during the time period surrounding Quick Bear's murder and, in Dr. Manlove's view, Huante trusted the detectives who were interviewing him.

[¶20.]     In his report, Dr. Manlove suggested that a hallmark of a false confession is that the "suspect's description doesn't match other facts." He did not, however, provide any support for this opinion, but rather offered a number of suggested areas for law enforcement inquiry that had nothing to do with false confessions, such as "Did anyone in the crowded bar see Mr. Huante shoot Dallas Quick Bear?" and "Did the gun have fingerprints on it? Were the fingerprints Mr. Huante's?"

[¶21.] In its objection to the admission of Dr. Manlove's testimony at trial, the State asked for an evidentiary hearing pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The circuit court conducted the *Daubert* hearing over two days during which Dr. Manlove offered testimony concerning his report and opinions.

[¶22.] Dr. Manlove described a false confession as "a personal confession to something that isn't true." He later opined that Huante's confession was a false one, not because Huante was necessarily innocent, but simply because a factual detail about how Quick Bear was shot was inaccurate.

[¶23.] Dr. Manlove also testified that "there was no doubt that there's lots of false confessions." But he acknowledged that "[t]here's not a forensic standard of care for assessing false confessions that I'm aware of." And when the State asked Dr. Manlove to compare the number of false confessions, listed in one article as 2,600,[1] with a much larger number approximating the total number of individuals involved in the criminal justice system, the following exchange occurred:

| | |
|---|---|
| **The State:** | But if it's 2,000 of 10 million, we're actually getting a very small collective; is that fair? |
| **Dr. Manlove:** | I think if you read those articles, it will tell you the percentage actually because I think those are in there. I don't know. Yeah, I'm |

---

1. Although Dr. Manlove alludes to this figure appearing in literature he reviewed, he does not cite a specific article. The 2,600 figure likely refers to the total number of wrongful conviction exonerations identified between 1989 and July 2020, not the total number of verified false confessions. Catherine L. Bonventre, *Wrongful convictions and forensic science*, WIREs Forensic Sci. 2021; 3:e1406 (June 9, 2021) https://doi.org/10.1002/wfs2.1406. Other sources that Dr. Manlove relies on in his report appear to put the number of known "interrogation-induced false confessions" at "approximately 250" since the late 1980s.

speculating about stuff that I've reviewed briefly or read through again last night and, you know, I'm – – we can – – I think it's not really very helpful for me to speculate when it's right there in front of you.

[¶24.] As for the Reid Technique, Dr. Manlove testified that it was "quite coercive when it's – when the tools that you're using to confront the person you're interrogating are not true." In fact, Dr. Manlove reiterated a conclusion from his report that Huante's confession was coerced:

> But I do say in number five [of the report] that there was a coerced confession. That, I stand by that. That is a term of art. That is in these articles – it was – whether it's true or not, I don't know, but I do feel pretty certain that based on, you know, the criteria for a coerced confession, that this was coerced. So I will not testify that he did or did not do the crime.

[¶25.] At one point during cross-examination, the State asked Dr. Manlove if he was "aware that the coercive nature of [the post-polygraph] interview was challenged." Defense counsel objected on the following basis:

> I'm going to object, Your Honor. That's a misstatement. It was at least from the sense of there was a legal challenge as to whether it crossed the legal threshold for the violation of constitutional rights. Dr. Manlove, that's not the question that's been presented to Dr. Manlove. So I want to make sure that's noted for the record. Those are two separate issues.

[¶26.] The circuit court sustained the objection. But the State returned to the suppression motion determination later:

> **The State:** Okay. And are you familiar that the techniques used in this case were determined by this Court to not overcome his will?
>
> **Dr. Manlove:** You know, I haven't read anything like that. I understand there was a previous hearing[,] and I don't know really exactly what happened there.

| **The State:** | Okay. Knowing that the Court has ruled that his will was not overcome by the interview techniques, does that change anything about your opinions? |
|---|---|
| **Dr. Manlove:** | Well, it doesn't change my opinion. The court may see things differently than me. I certainly can understand that. |

[¶27.] In a written order, the circuit court stated it was denying the State's objection to Dr. Manlove's testimony and would allow him to testify about all four areas of inquiry that defense counsel referred to him. Significantly, however, the court also sharply limited Dr. Manlove's testimony in the following way:

> Dr. Manlove is[,] however, prohibited from outlining the *facts of this case* as it relates to whether the specific facts of this case "fit the mold" of a false confession (e.g., that the police lied to the defendant, that the defendant trusted law enforcement, that the defendant had no independent recollection of the events, that the defendant failed a polygraph test, etc.) and is further prohibited from providing his ultimate opinion that this was a "coerced confession."

[¶28.] The latter restriction concerning opinions about a coerced confession was not based upon the fact that the issue of coercion had been litigated earlier in the suppression motion. Rather, the circuit court found "that this type of expert testimony invades the province of the jury."

[¶29.] We granted the State's petition for an intermediate appeal.

## Analysis and Decision

### *Standard and scope of review*

[¶30.] "Trial courts enjoy broad discretion in ruling on the admissibility of expert opinions." *State v. Carter*, 2023 S.D. 67, ¶ 45, 1 N.W.3d 674, 690 (quoting *Garland v. Rossknecht*, 2001 S.D. 42, ¶ 9, 624 N.W.2d 700, 702); *see also Gen. Elec.*

*Co. v. Joiner*, 522 U.S. 136, 142 (1997) (clarifying that a trial court's decision to admit or exclude expert testimony is to be reviewed for an abuse of discretion). "Such determinations will not be reversed absent a clear abuse of discretion." *Carter*, 2023 S.D. 67, ¶ 45, 1 N.W.3d at 690 (citation modified). An abuse of discretion "is a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable." *State v. Pretty Weasel*, 2023 S.D. 41, ¶ 28, 994 N.W.2d 435, 441 (quoting *State v. Hankins*, 2022 S.D. 67, ¶ 21, 982 N.W.2d 21, 30). "[W]hen a trial court misapplies a rule of evidence, as opposed to merely allowing or refusing questionable evidence, it abuses its discretion." *State v. Birdshead*, 2015 S.D. 77, ¶ 51, 871 N.W.2d 62, 79 (quoting *State v. Packed*, 2007 S.D. 75, ¶ 24, 736 N.W.2d 851, 859).

[¶31.] Though deferential, our abuse of discretion standard is meaningful; it does not immunize a trial court's decision from appellate review. As we recently explained,

> the standard is violated when the circuit court clearly errs in weighing the relevant factors. This includes instances where the court fails to consider a relevant factor that should have received significant weight, or gives significant weight to an improper or irrelevant factor.

*Olson v. Huron Reg'l Med. Ctr., Inc.*, 2025 S.D. 34, ¶ 19, 24 N.W.3d 405, 412–13 (citation modified); *see also State v. Mitchell*, 2021 S.D. 46, ¶ 39, 963 N.W.2d 326, 335 (holding a circuit court's decision was "outside the range of permissible choices" because it did not consider a relevant factor (quoting *State v. Rice*, 2016 S.D. 18, ¶ 23, 877 N.W.2d 75, 83)).

#30764

[¶32.] In addition to the standard of review, our consideration of the evidentiary issue presented in this appeal is affected by the limitations the circuit court placed upon Dr. Manlove's proposed testimony. As noted, the court ordered that Dr. Manlove could not relate his testimony to the facts of this case or Huante's post-polygraph interview and confession. Nor could Dr. Manlove offer an opinion that Huante's confession was coerced. Huante has not sought review of these restrictions, and they are, consequently, not presented for our direct analysis.

### *Rule 702 and Daubert*

[¶33.] We begin in earnest with the principal evidentiary rule addressing the admissibility of expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) The testimony is based on sufficient facts or data;
>
> (c) The testimony is the product of reliable principles and methods; and
>
> (d) The expert has reliably applied the principles and methods to the facts of the case.

SDCL 19-19-702 (Rule 702).

[¶34.] The text of Rule 702 imposes three preliminary questions that a court must answer before admitting a purported expert's testimony at trial: (1) whether the witness is qualified to testify as an expert about the subject matter at issue; (2) whether the witness's testimony will help the trier of fact understand the evidence

-12-

or determine a fact in issue; and (3) whether the testimony is sufficiently trustworthy, meaning it is the result of reliable principles and methods that have been reliably applied to the facts of this case.

### *Dr. Manlove's qualification as an expert in false confessions*

[¶35.] "Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *State v. Lemler*, 2009 S.D. 86, ¶ 18, 774 N.W.2d 272, 278 (quoting *Maroney v. Aman*, 1997 S.D. 73, ¶ 39, 565 N.W.2d 70, 79). "[T]he distinction between lay and expert witness testimony is that lay testimony 'results from a process of reasoning familiar with everyday life,' while expert testimony 'results from a process of reasoning which can be mastered only by specialists in the field.'" 6 *Jones on Evidence* § 43:4, Westlaw (database updated Nov. 2025) (alteration in original) (citing Advisory Comm. Notes, Fed. R. Evid. 701). "Reading, study, and practice can be a source of education and knowledge sufficient to qualify a person as an expert." *Lemler*, 2009 S.D. 86, ¶ 21, 774 N.W.2d at 279 (quoting *Burley v. Kytec Innovative Sports Equip., Inc.*, 2007 S.D. 82, ¶ 19, 737 N.W.2d 397, 404).

[¶36.] The circuit court found Dr. Manlove to be "an expert in the field of psychiatry," which the court explained as "a large body of knowledge [that] contains many subsets of expertise." Because "'[f]alse confessions' and interview techniques both fall under the broad umbrella of psychiatry," the court further determined that Dr. Manlove's "expert knowledge in the field of psychiatry" qualifies him to "testify about 'false confessions' and interview techniques in this case."

[¶37.]     Whether Dr. Manlove qualifies as an expert in this case is a very close call.  There is no question that Dr. Manlove is qualified as an expert in the field of forensic psychiatry and has testified in many cases previously.  But the majority of Dr. Manlove's prior professional experience dealt with a defendant's competency or claims of insanity, not false confessions.  On this topic, Dr. Manlove's qualifications are rather opaque—as revealed by the State's examination at the *Daubert* hearing:

> **The State:**     Can you point out in your C.V. anywhere, any of the things that's listed on there that would be relevant to false confessions in your expertise in that area?
>
> **Dr. Manlove:** Sure.  I'm a forensic psychiatrist board certified in forensic psychiatry.
>
> **The State:**     And what is your area of forensic psychiatry?
>
> **Dr. Manlove:** The whole area.
>
> **The State:**      The whole area.
>
> **Dr. Manlove:** Yep.
>
> **The State:**      Okay.  What is the whole area?
>
> **Dr. Manlove:** Well, I do criminal, I do civil, I do really any case that I'm asked to look at that looks at the interface between psychiatry and the law.
>
> **The State:**     Okay.  So specifically to false confessions, what training do you have in that area?
>
> **Dr. Manlove:** I've had limited coursework.  I've taken courses on it.  I've done my own research as represented in this volume of papers.
>
> **The State:**     Okay.  What coursework have you attended?
>
> **Dr. Manlove:** I routinely go to the American Academy of Psychiatry and Law conferences.  They're one a

-14-

year, different places, and I can't tell you which course that I took.

**The State:** Okay. How many courses through that conference have you taken in regards to false confessions?

**Dr. Manlove:** I don't know.

**The State:** One?

**Dr. Manlove:** I don't know.

**The State:** Two?

**Dr. Manlove:** I don't know.

**The State:** More than zero?

**Dr. Manlove:** More than zero. I would say five to ten.

**The State:** How long ago?

**Dr. Manlove:** I don't know. I don't write these things down and keep track of them.

**The State:** Okay. And you said you have done research?

**Dr. Manlove:** No.

* * *

**Dr. Manlove:** I've researched other people – – the literature.

**The State:** So you've read the literature.

**Dr. Manlove:** Yeah. That's true.

**The State:** But you have conducted zero research.

**Dr. Manlove:** Correct.

* * *

**The State:** How many cases have you done individually that deal with false confessions?

**Dr. Manlove:** I'm not sure, but it's at least three or four.

**The State:** Three or four. Can you give me the names?

**Dr. Manlove:** No.

**The State:** Can you give me the years?

**Dr. Manlove:** No.

\* \* \*

**The State:** And did you testify?

**Dr. Manlove:** I don't recall.

[¶38.] But this Court has repeatedly emphasized the deference we give to a circuit court's decision to qualify a witness as an expert. *Lemler*, 2009 S.D. 86, ¶ 21, 774 N.W.2d at 279–80. And despite Dr. Manlove's desultory description of his professional experience with false confessions, the record illustrates that he engaged in a literature review of research within the subset of false confessions. Given this reading and study, combined with his medical training and board certification, we cannot say the circuit court's decision to qualify Dr. Manlove as an expert was "a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable." *Weiland v. Bumann*, 2025 S.D. 9, ¶ 57, 18 N.W.3d 148, 161 (quoting *Weber v. Weber*, 2023 S.D. 64, ¶ 15, 999 N.W.2d 230, 234).

### *Helpfulness under Rule 702 and Daubert*

[¶39.] Still, it is not enough for a witness to be qualified as an expert. Rule 702 requires that an expert's testimony "will help the trier of fact." And "an expert's opinion is helpful only to the extent the expert draws on some special skill,

knowledge, or experience to formulate his opinion; the opinion must be an *expert* opinion (that is, an opinion informed by the witness's expertise) rather than simply an opinion broached by a purported expert." *United States v. Hall*, 93 F.3d 1337, 1343 (7th Cir. 1996) (citation modified); *see also Klein v. Vanek*, 86 F. Supp. 2d 812, 818 (N.D. Ill. 2000) ("[A]n expert's credentials and methodology may be impeccable, but if the proffered testimony . . . is not likely to 'assist the trier of fact to understand the evidence or to determine a fact in issue,' then the [circuit] court should reject the proffer." (quoting *Hall*, 93 F.3d at 1342)).

[¶40.]    Though no provision of Rule 702 is preeminent, this "helpfulness" requirement expresses the essential justification for allowing expert testimony at all.  Indeed, a trial court's authority to admit expert testimony should not be invoked simply to balance the evidentiary parity between partisans—but only if a party's proffered expert will truly assist the trier of fact.  The helpfulness standard of Rule 702 is perhaps a central, unifying principle suffusing the area of law that surrounds it.  *See Hall*, 93 F.3d at 1342 (stating that the "ultimate test" when evaluating an expert's proffered testimony "is whether the testimony would assist the trier of fact in understanding the evidence").

[¶41.]    In its formative decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the United States Supreme Court held that proffered expert testimony should be assessed for its relevance and reliability.  *See also State v. Yuel*, 2013 S.D. 84, ¶ 8, 840 N.W.2d 680, 683 ("South Dakota has adopted the *Daubert* test . . . .").  Mapped onto Rule 702, *Daubert* holds that expert testimony that is not helpful to the factfinder is not relevant—nor is expert testimony that lacks reliability.  *See*

*People v. Kowalski*, 821 N.W.2d 14, 24–25 (Mich. 2012) (describing the overlapping nature of Michigan's nearly identical Rule 702 and noting that "expert testimony without a credible foundation of scientific data, principles, and methodologies is unreliable and, thus, unhelpful to the trier of fact" (citing *Gilbert v. DaimlerChrysler Corp.*, 685 N.W.2d 391, 413 (Mich. 2004))).

[¶42.]    Relevant evidence, of course, is "evidence having any tendency to make any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *State v. Guthrie*, 2001 S.D. 61, ¶ 32, 627 N.W.2d 401, 415 (quoting what is now SDCL 19-19-401 (Rule 401)). But the *Daubert* standard for relevance is more than just legal relevance under Rule 401, as we have recognized:

> The Supreme court has explained that under Rule 702, this fact-in-issue aspect of relevancy "is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591, 113 S. Ct. at 2796. In other words, the factual relevancy question is dependent on whether there is a sufficient "fit" between the specific facts of the case and proffered expert testimony. *Id.*

*State v. Huber*, 2010 S.D. 63, ¶ 33, 789 N.W.2d 283, 293 (quoting *Daubert*, 509 U.S. at 591).

[¶43.]    As for reliability, we have said that "an expert's opinion is reliable if it is derived from the foundations of science rather than subjective belief." *Guthrie*, 2001 S.D. 61, ¶ 36, 627 N.W.2d at 416–17 (citing *Daubert*, 509 U.S. at 589–90).

> A circuit court may consider the following nonexclusive guidelines for assessing [the reliability of] an expert's methodology: (1) whether the method is testable or falsifiable; (2) whether the method was subjected to peer review; (3) the known or potential error rate; (4) whether the standards exist to

control procedures for the method; (5) whether the method is generally accepted; (6) the relationship of the technique to methods that have been established as reliable; (7) the qualifications of the expert; and (8) the non-judicial uses to which the method has been put.

*Huber*, 2010 S.D. 63, ¶ 25, 789 N.W.2d at 290–91 (quoting *Guthrie*, 2001 S.D. 61, ¶ 35, 627 N.W.2d at 416).

[¶44.] Though helpful, this list of factors "neither necessarily nor exclusively applies to all experts or in every case." *Lemler*, 2009 S.D. 86, ¶ 24, 774 N.W.2d at 280 (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999)). In short, Rule 702 "strike[s] a balance between two competing concerns: the apprehension for the free-for-all admission of unreliable theories that might baffle juries and a 'stifling and repressive scientific orthodoxy' that might inhibit new truths or legitimate cases." *Constructora Mi Casita, S de R.L. de C.V. v. NIBCO, Inc.*, 448 F. Supp. 3d 965, 971 (N.D. Ind. 2020) (quoting *Daubert*, 509 U.S. at 596).

[¶45.] The proponent of expert testimony "bears the burden of demonstrating that the proffered testimony is 'based on scientifically valid principles' that will satisfy the reliability demands." *State v. Jackson*, 2020 S.D. 53, ¶ 43, 949 N.W.2d 395, 408 (quoting *Lemler*, 2009 S.D. 86, ¶ 23, 774 N.W.2d at 280). The judge has a gatekeeping duty in this process and "is 'supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable.'" *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) (quoting *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013)).

[¶46.] Whatever intuitive appeal the four helpful-sounding topical areas of Dr. Manlove's testimony might have initially held, it did not come to pass. These

four categories were, in the end, more aspirational than substantive. We address

each in turn under the standards set out in Rule 702 and *Daubert*.

> a. *General false confession opinions—existence, reasons, frequency*

[¶47.] The circuit court's order permits Dr. Manlove to testify about how false

confessions can be counterintuitive, "that subsequent DNA exonerations have

revealed their existence," and their prevalence. As it was proffered, Dr. Manlove's

testimony should not be admitted on any of these topics.

[¶48.] The existence of false confessions is simply a fact, not an opinion, much

less an expert one. Nor is it disputed. At the suppression hearing, Detectives

Harding and Randazzo both acknowledged the possibility that a person could make

a false confession.

[¶49.] The idea that an expert could help a lay jury understand false

confessions set against their counterintuitive nature holds more promise, especially

in light of the reasonable premise that "[a] person does not ordinarily make

untruthful incriminating statements." *See Kowalski*, 821 N.W.2d at 28; *see also*

*Hopt v. People*, 110 U.S. 574, 585 (1884) (stating that "one who is innocent will not

imperil his safety or prejudice his interests by an untrue statement"); SDCL 19-19-

804(b)(3) (excepting from the rules against hearsay a declarant's statement against

interest because they are considered more trustworthy).

[¶50.] In a related way, we have previously allowed expert testimony to

explain how under certain circumstances individuals may act in a way that does not

comport with a lay person's understanding of human behavior. *E.g.*, *State v.*

*Snodgrass*, 2020 S.D. 66, ¶ 50, 951 N.W.2d 792, 807 (holding expert testimony

regarding "red flags" that suggest coaching of child witnesses was not improper vouching); *State v. Johnson*, 2015 S.D. 7, ¶ 34, 860 N.W.2d 235, 248 (affirming the circuit court's decision that expert testimony regarding delayed reporting, "grooming," and the psychological effects of sexual abuse was reliable); *State v. Buchholtz*, 2013 S.D. 96, ¶ 31, 841 N.W.2d 449, 460 ("Experts can fairly testify to what types of behaviors might indicate child sexual abuse, give insights through expert evaluation of a witness, and educate jurors on matters that will help them to assess credibility . . . ."); *State v. Weaver*, 2002 S.D. 76, ¶¶ 24–27, 648 N.W.2d 355, 364–65 (per curiam) (holding that expert's testimony regarding the "cycle of violence" and "battered women's syndrome" were reliable);[2] *State v. Edelman*, 1999 S.D. 52, ¶ 18, 593 N.W.2d 419, 423 (holding that an expert's opinions based on literature concerning Child Sexual Abuse Accommodation Syndrome were reliable).

[¶51.]        But Dr. Manlove does not actually explain why false confessions occur—only that they do, or at least have. In this regard, Dr. Manlove simply points to reported cases in which individuals were convicted of crimes and later exonerated by objective evidence, like DNA. But this is a self-evident inference that lay jurors can easily understand by applying basic logic. *See People v. Bedessie*, 970 N.E.2d 380, 385 (N.Y. 2012) ("That the phenomenon of false confessions is genuine has moved from the realm of startling hypothesis into that of common knowledge, if not conventional wisdom."). And Dr. Manlove's testimony seems to acknowledge as

---

2.     In *Weaver*, we also briefly addressed a relevancy argument, holding that the expert testimony was legally relevant under Rule 401 because it explained why a domestic violence victim would recant an initial claim of abuse. 2002 S.D. 76, ¶ 22, 648 N.W.2d at 364.

much: "people have always been aware that there were probably false confessions . . . ."

[¶52.] In addition, the fact that false confessions have been confirmed after a person has been exonerated offers no assistance to the jurors here because there is no "fit" to the circumstances of this case for two reasons. First, this case does not, of course, involve either exoneration or the retrospective discovery of a false confession.

[¶53.] Second, Dr. Manlove's proffered opinions about the existence and incidence of false confessions are unsupported by any type of reliable methodology. *See Jaasma v. Shell Oil Co.*, 412 F.3d 501, 513 (3d Cir. 2005) (stating how the expert's methodology must fit the facts of the case but also be reliable). Expert testimony must be "based on sufficient facts and data" and be "the product of reliable principles and methods." SDCL 19-19-702. In its duty as gatekeeper, the circuit court "separates expert opinion evidence based on 'good grounds' from subjective speculation that masquerades as scientific knowledge." *Glastetter v. Novartis Pharms. Corp.*, 252 F.3d 986, 989 (8th Cir. 2001).

[¶54.] The proffered testimony regarding the prevalence of false confessions is simply not sufficiently reliable under Rule 702's trustworthiness standard. Although there are studies which attempt to demonstrate the prevalence of false confessions in wrongful conviction cases, "[s]cholars do not know how frequently interrogation-induced false confessions occur or how frequently (or what percentage of) interrogation-induced false confessions lead to the wrongful conviction of the innocent." *United States v. Deuman*, 892 F. Supp. 2d 881, 887 (W.D. Mich. 2012)

(quoting Steven A. Drizin & Richard A. Leo, *The Problem of False Confessions in the Post-DNA World*, 82 N.C. L. Rev. 891, 931 (2004)).[3]

[¶55.] The social science research on false confessions "has not led to any concrete theories or predictors about when and why false confessions occur." *State v. Wooden*, No. 23992, 2008 WL 2814346, at *4 (Ohio Ct. App. July 23, 2008). Because it is "difficult, if not impossible . . . to authoritatively determine the underlying truth or falsity of [a] confession[,] . . . researchers [are] not able to provide a scientific or authoritative estimate" on the prevalence of false confessions or "of the rate at which they lead to miscarriages of justice." *Deuman*, 892 F. Supp. 2d at 887 (quoting Drizin & Leo, *supra*, at 931).

[¶56.] Finally, Dr. Manlove's opinion that "[f]alse confessions are not uncommon" is at best untestable and at worst patently inaccurate. His only effort to quantify the prevalence of false confessions comes in the form of a statement in his report in which he writes: "Since the late 1980s, six studies alone have documented approximately 250 interrogation-induced false confessions." Understanding, of course, that the number of false confessions does not have any acceptable level of tolerance, Dr. Manlove's opinion that 250 false confessions since the "late 1980s" makes them "not uncommon" lacks any reference to the total

---

3. Experts studying false confessions "cannot say how frequently [false confessions] occur, because there is no database maintained by the government or a private organization that makes all police interrogations available to us, from which we could do a random sample and then come up with an error rate or, you know, a false confession rate." *United States v. Begay*, 310 F. Supp. 3d 1318, 1333 (D.N.M. 2018) (first alteration in original) (quoting false confession expert Richard A. Leo).

number of confessions that were obtained over the same period and seems, candidly, hyperbolic. *See supra* n.2.

        *b.    Opinions regarding interview tactics and coercion*

[¶57.]      The circuit court's order also permits Dr. Manlove to testify about how "certain interrogation (interview) tactics are more likely to lead to false confessions" and about "the Reid Technique[,] which can include contamination and the police claiming or suggesting they have more evidence than they do."

[¶58.]      At the outset, there is again a real question as to whether Dr. Manlove, despite being a forensic psychiatrist, possesses the requisite "knowledge, skill, experience, training, or education" to qualify as an expert in police interrogation techniques under Rule 702.[4] But, regardless, Dr. Manlove's proffered testimony runs headlong into the restrictions set out in the circuit court's order:[5]

> Dr. Manlove is, however, prohibited from outlining t*he facts of this case* as it relates to whether the specific facts of this case "fit the mold" of a false confession (e[.]g. that the police lied to the defendant, that the defendant trusted law enforcement, that the defendant had no independent recollection of the events, that the defendant failed a polygraph test, etc.) and is further prohibited from providing his ultimate opinion that this was a "coerced confession."

---

4.    Dr. Manlove's testimony centered on the Reid Technique, but he is not trained in the Reid Technique and has not done any research or scholarship on it, though he testified that he read a book about the Reid Technique in preparation for this case.

5.    The dissent appears to misread our opinion as stating that Dr. Manlove is unqualified to provide expert testimony about law enforcement interrogation techniques. But at no point do we hold that Dr. Manlove's opinions are inadmissible because he did not qualify as an expert. *See supra* ¶¶ 36–38. The fateful problem with Dr. Manlove's interrogation technique testimony is that its proposed use directly violates the circuit court's order restricting Dr. Manlove's testimony—an issue the dissent does not dispute.

[¶59.]     The primary focus of Dr. Manlove's opinion implicates all of these things: he believes Huante's confession is consistent with a false confession; he is critical of the detectives, who he thinks lied to Huante and supplied him with a narrative to fill in lapses in memory, particularly after the failed polygraph; and he most certainly opines that Huante's confession was coerced. Simply put, most of Dr. Manlove's opinions in this topical area cannot coexist with the restrictions the circuit court imposed.

[¶60.]     But, even if the court's order did not prohibit them, Dr. Manlove's opinions are neither reliable nor helpful to the jury. The theories upon which Dr. Manlove's testimony relies "cannot discern whether a certain interrogation technique, used on a person with certain traits or characteristics, results in a predictable rate of false confessions." *Deuman*, 892 F. Supp. 2d at 886. While it is possible that certain interrogation tactics may increase the risk of false confessions, these same "interrogation techniques [can] also result in true confessions." *Id.* at 886–87 (citing *Wooden*, 2008 WL 2814346, at *4).

[¶61.]     And Dr. Manlove provides no reliable technique or methodology to accurately assess when certain interrogation techniques result in a false confession. At best, Dr. Manlove's testimony provides the unremarkable proposition that coercive interrogation techniques can result in a false confession, just as they can result in a true confession. This sort of generic opinion would not assist a lay jury in this case.

[¶62.]     We recognize that "the circumstances surrounding the taking of a confession can be highly relevant to two separate inquiries, one legal and one

factual." *Crane v. Kentucky*, 476 U.S. 683, 688 (1986). But the legal inquiry—voluntariness—was litigated in Huante's motion to suppress his confession, which the circuit court denied, finding that Huante's "statements were not the product of coercive forces." *See State v. Fisher*, 2011 S.D. 74, ¶ 17, 805 N.W.2d 571, 575. Huante cannot use Dr. Manlove's testimony to relitigate this earlier finding.

[¶63.] The factual inquiry—the accuracy and credibility of Huante's statements—is for the jury. *State v. Albright*, 418 N.W.2d 292, 297 (S.D. 1988) ("[T]he jury must determine the weight to be given to the confession and the truthfulness of the person relating the confession."), *abrogated on other grounds by*, *Horton v. California*, 496 U.S. 128, 152 (1990). Even confessions "that have been found to be voluntary, are not conclusive of guilt." *Crane*, 476 U.S. at 689. And "the physical and psychological environment that yielded the confession can also be of substantial relevance to the ultimate factual issue of the defendant's guilt or innocence." *Id.*

> Indeed, stripped of the power to describe to the jury the circumstances that prompted his confession, the defendant is effectively disabled from answering the one question every rational juror needs answered: If the defendant is innocent, why did he previously admit guilt? Accordingly, regardless of whether the defendant marshaled the same evidence earlier in support of an unsuccessful motion to suppress, and entirely independent of any question of voluntariness, a defendant's case may stand or fall on his ability to convince the jury that the manner in which the confession was obtained casts doubt on its credibility.

*Id.*

[¶64.] Here, then, Huante can still argue that his confession is not accurate using evidence of the actual recording of the police interrogation, through cross-

examination of the detectives concerning their interrogation techniques, and by highlighting the factual inconsistency between Huante's confession and the physical evidence.

### c. Opinions regarding susceptibility to false confessions

[¶65.] The circuit court's order permits Dr. Manlove to testify about how "[c]ertain persons are more likely to be susceptible to making false confessions." Research suggests that some individuals may possess dispositional factors that make them more susceptible to giving false confessions, like an individual with a diagnosable psychiatric disorder or intellectual disability. *See* Chojnacki, Cicchini, & White, *An Empirical Basis for the Admission of Expert Testimony on False Confessions*, 40 Ariz. St. L.J. 1, 15–17 (2008); *Bedessie*, 970 N.E.2d at 387.

[¶66.] When such factors are present, a number of courts have allowed expert testimony that educates a jury on the defendant's specific psychological condition and its relevance to assessing the reliability of his or her confession. *See Hall*, 93 F.3d at 1345 (holding that exclusion of expert testimony to educate the jury on defendant's personality disorder was reversible error); *United States v. Shay*, 57 F.3d 126, 133 (1st Cir. 1995) (holding that expert testimony was admissible to help a jury that "plainly was unqualified to determine without assistance the *particular* issue of whether [the defendant] may have made false statements against his own interests because he suffered from a mental disorder"); *People v. Flippo*, 159 P.3d 100, 105–06 (Colo. 2007) (en banc), *as modified by denial of reh'g* (June 11, 2007) (holding that expert testimony of defendant's low IQ and desire to please made him susceptible to agree with police was admissible with proper notice); *Pritchett v.*

*Commonwealth*, 557 S.E.2d 205, 208 (Va. 2002) (holding that exclusion of mental health expert testimony on the defendant's intellectual disability and tendency to be compliant made him vulnerable to suggestibility).

[¶67.]     But here, Dr. Manlove does not identify any psychiatric diagnosis that would put Huante at an increased susceptibility to make a false confession. In fact, Dr. Manlove testified that Huante does *not* suffer from a lack of intellectual capacity that "might make [him] unable to defend [himself] in an interview properly." In his report, Dr. Manlove identified two non-organic reasons he thought made Huante susceptible to making a false confession—(1) Huante trusted the detectives who were interviewing him, and (2) he did not have a clear memory of the events of February 20, 2022, surrounding Quick Bear's murder. However, there is no evidence to connect these facts to a recognized psychiatric susceptibility that would support a false confession theory.

[¶68.]     Additionally, the two justifications Dr. Manlove gave for Huante being susceptible to giving a false confession are explicitly proscribed by the unappealed restrictions contained in the circuit court's order: "Dr. Manlove is[,] however, prohibited from outlining the *facts of this case* as it relates to whether the specific facts of this case 'fit the mold' of a false confession," including whether "the defendant trusted law enforcement" or whether "the defendant had no independent recollection of the events."

[¶69.]     Therefore, any testimony of Dr. Manlove's relating to Huante's susceptibility is either irrelevant because Huante does not have a psychiatric

disorder or intellectual disability that increases his susceptibility to false confessions or is otherwise explicitly excluded by the circuit court's order.

> d.     *The confession does not match the facts*

[¶70.]     The circuit court's order prohibits Dr. Manlove from offering his opinion that Huante's confession "fit[s] the mold" of a false confession. The order, however, does appear to permit a generic description of the hallmarks of a false confession. But based upon Dr. Manlove's report and testimony, it is not clear what those hallmarks are, or if an accurate set of markers for false confessions even exists.

[¶71.]     The only indication of a false confession identified by Dr. Manlove is the factual incongruity between Huante's confession to shooting Quick Bear under the chin and the physical evidence that establishes the point of entry for the fatal bullet was in the back of the neck. The testimony from the *Daubert* hearing makes clear that Dr. Manlove considered the factual inaccuracy to be the aspect that rendered Huante's entire confession a false one. In this regard, Dr. Manlove appears to simply conflate a confession containing a factual inaccuracy with a confession that is falsely inculpatory. But Dr. Manlove offered no source or science to support this type of *non sequitur* conclusion.

[¶72.]     Nor is there anything in Dr. Manlove's testimony that would support the idea that factual inaccuracies are confined to false confessions. Indeed, true confessions may contain factual inaccuracies resulting from any number of potential factors. But, in any event, if the factual details of a confession are not consistent with the State's physical evidence, members of the jury could see the bare factual

incongruity and weigh the reliability of the confession just as easily without an expert.

[¶73.] Furthermore, Dr. Manlove's testimony regarding hallmarks of a false confession is not based on a sufficiently reliable methodology—a requirement for admissibility under Rule 702. Dr. Manlove's own testimony acknowledged that "[t]here's not a forensic standard of care for assessing false confessions that I'm aware of." On this issue, Dr. Manlove's proffered testimony rested on literature that reviewed known false confessions and looked for "certain patterns" or commonalities that existed among a sample of those known false confessions. Dr. Manlove then reviewed Huante's interview looking for similar attributes.

[¶74.] However, even if Huante's interview does share certain patterns with known false confessions, that fact alone does not make Dr. Manlove's methodology in this case reliable. A methodology that looks only at false confessions to decide the "hallmarks" of a false confession without considering whether those same patterns also appear in true confessions does not account for the possibility that the "hallmarks" might be typical for *any* type of confession.

[¶75.] This is also true for the literature underlying Dr. Manlove's testimony, which suffers from the same selection bias. Because the methodology Dr. Manlove relies on to derive these certain "hallmarks" does not include a sample pool containing both proven false confessions and true confessions, it cannot be tested or

subjected to a rate of error analysis, making Dr. Manlove's proffered testimony on this point distinctly unhelpful.[6]

### *False confessions and expert testimony more broadly*

[¶76.]         Like any citizen, but particularly as judges, we find the existence of false confessions grave and discomfiting.  "False confessions that precipitate a wrongful conviction manifestly harm the defendant, the crime victim, society[,] and the criminal justice system." *Bedessie*, 970 N.E.2d at 388.  And our decision today should not be viewed as a definitive ruling that expert testimony on the issue of false confessions is never admissible.  That question will have to wait for another day.  Our decision here involves narrower issues confined to the particular circumstances of this case—the circuit court's application of the helpfulness standard under Rule 702 and *Daubert*, the perceptible tension in the court's order that significantly restricted Dr. Manlove's testimony, and the lack of any reliable methodology that would help the jury determine whether a confession can be assessed as false.

### Conclusion

[¶77.]         The circuit court abused its discretion by permitting Dr. Manlove's opinions about false confessions because they are not relevant or reliable under

---

6.     The dissent suggests that we have subjected Dr. Manlove's opinions to an insuperable evidentiary standard of definitive correctness, not simply Rule 702/*Daubert* helpfulness.  But we do no such thing. *See supra* ¶¶ 39–41. More to the point, though, the dissent does not explain exactly how Dr. Manlove's proffered testimony can assist the jury when it overstates the frequency and incidence of false confessions, lacks a forensic standard (*or any means*) for detection, and is hemmed in on all sides by the unappealed circuit court restrictions.

*Daubert*. Dr. Manlove could not accurately convey the frequency or incidence of false confessions; nor did he marshal his qualifications as a forensic psychiatrist to explain under any reliable methodology why, when, or how false confessions occur or to identify characteristics unique to false confessions. These problems were unmistakably apparent at the *Daubert* hearing. In addition, many of Dr. Manlove's opinions are not permitted under the circuit court's own restrictions, and the specific opinion that Huante's confession was coerced is an improper effort to relitigate the court's denial of his earlier suppression motion on the same basis. Accordingly, we reverse the circuit court's order allowing Dr. Manlove to testify at trial and remand for further proceedings consistent with this opinion.

[¶78.] JENSEN, Chief Justice, and DEVANEY, Justice, and KERN, Retired Justice, concur.

[¶79.] MYREN, Justice, dissents.

[¶80.] GUSINSKY, Justice, not having been a member of the Court at the time this action was considered by the Court, did not participate.

MYREN, Justice (dissenting).

[¶81.] I respectfully dissent from the majority opinion's determination that the circuit court abused its discretion when it concluded that Dr. Manlove was permitted to testify as an expert regarding false confessions and law enforcement interrogation techniques.

[¶82.] We apply the abuse of discretion standard when reviewing a circuit court's decision regarding expert testimony. *State v. Carter*, 2023 S.D. 67, ¶ 45, 1 N.W.3d 674, 690 (citation omitted). An abuse of discretion "is a fundamental error

of judgment, a choice outside the range of permissible choices, a decision, which on full consideration, is arbitrary or unreasonable." *State v. Pretty Weasel*, 2023 S.D. 41, ¶ 28, 994 N.W.2d 435, 441 (quoting *State v. Hankins*, 2022 S.D. 67, ¶ 21, 982 N.W.2d 21, 30). The abuse of discretion standard of review "is the most deferential standard of review available with the exception of no review at all." *State v. Janklow*, 2005 S.D. 25, ¶ 39, 693 N.W.2d 685, 699 (quoting *In re S.D. Microsoft Antitrust Litig.*, 2003 S.D. 19, ¶ 27, 657 N.W.2d 668, 678). This is because this Court could disagree with the circuit court's decision and still conclude it did not abuse its discretion. *See State v. Huber*, 2010 S.D. 63, ¶ 55, 789 N.W.2d 283, 301 ("Thus, the question is not whether, had we been the trial judge, would we have admitted the . . . evidence but whether the trial court sitting in this case abused its discretion by doing so." (citation omitted)). For this reason, "we must be careful not to substitute our reasoning for that of the trial court." *Janklow*, 2005 S.D. 25, ¶ 32, 693 N.W.2d at 697 (quoting *State v. Jolley*, 2003 S.D. 5, ¶ 5, 656 N.W.2d 305, 307).

[¶83.] Before the circuit court could admit Dr. Manlove's testimony, it needed to determine that it was relevant and reliable in accordance with *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). "Relevance embraces 'evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Burley v. Kytec Innovative Sports Equip., Inc.*, 2007 S.D. 82, ¶ 13, 737 N.W.2d 397, 403 (quoting *State v. Guthrie*, 2001 S.D. 61, ¶ 32, 627 N.W.2d 401, 415). In the context of expert testimony, the inquiry "is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the

jury in resolving a factual dispute." *State v. Huber*, 2010 S.D. 63, ¶ 33, 789 N.W.2d 283, 293 (quoting *Daubert*, 509 U.S. at 591). "Generally, an expert's opinion is reliable if it is derived from the foundations of science[,] rather than subjective belief." *Guthrie*, 2001 S.D. 61, ¶ 36, 627 N.W.2d at 416–17 (citing *Daubert*, 509 U.S. at 589–90 ). "[T]he goal is to ensure that expert testimony is based on sound methods and valid procedures." *Supreme Pork, Inc. v. Master Blaster, Inc.*, 2009 S.D. 20, ¶ 65, 764 N.W.2d 474, 492 (quoting *Wells v. Howe Heating & Plumbing, Inc.*, 2004 S.D. 37, ¶ 16, 677 N.W.2d 586, 592).

[¶84.] The circuit court was correctly oriented to its role as defined in *Daubert*. First, the circuit court determined that Dr. Manlove's testimony was relevant. Huante's defense is premised on the theory that he falsely confessed during his post-polygraph interview. Huante maintains that his memory of the night of the shooting was poor because of his intoxication. Yet, during his post-polygraph interview, he admitted to killing Quick Bear. To contextualize this discrepancy, Dr. Manlove was prepared to testify that poor memory can make somebody more susceptible to admitting things they did not do or things they do not know whether they did. Dr. Manlove was also prepared to testify that interviewers' factual suggestions can influence people in that situation. Huante intended to draw the jury's attention to instances during the interview when law enforcement falsely suggested to him that the polygraph demonstrated that he knew he killed Quick Bear, and other instances where they falsely indicated they had evidence of his guilt. *See State v. Fana-Ruiz*, 2019 WL 3764580, at *7 (Del. Super. Ct. Aug. 9, 2019) (concluding expert testimony on false confessions was "relevant under the

circumstances" because of the defendant's intoxication and the interrogation tactics used by law enforcement). The circuit court did not abuse its discretion when it concluded that Dr. Manlove's expert testimony was relevant to a fact of consequence that the jury needed to resolve.

[¶85.] Second, the circuit court determined that Dr. Manlove's testimony was reliable. Regarding Dr. Manlove's testimony about false confessions, the science he relied on in preparing his report is rooted in research conducted by others that reviewed proven cases of false confessions and analyzed the circumstances of those confessions to identify factors relevant to the reasons for the false confessions. Clearly, information about these relevant factors may be helpful to a finder of fact in assessing Huante's claim that his confession was false, even if Dr. Manlove is not permitted to apply this research to the facts of this case. As this Court has steadfastly held, "an expert's testimony may be admissible even if the expert's sole function is 'to educate the factfinder about general principles, without ever attempting to apply [those] principles to the specific facts of the case.'" *State v. Johnson*, 2015 S.D. 7, ¶ 33, 860 N.W.2d 235, 248 (alteration in original) (citation omitted). This is consistent with the principle identified in SDCL 19-19-702(a)— that expert testimony must "help the trier of fact to understand the evidence or to determine a fact in issue[.]"

[¶86.] Applying these principles, this Court has consistently determined that circuit courts have not abused their discretion when they admitted testimony based on methodologies that are not appreciably different than the one used by Dr. Manlove in this case. *See State v. Snodgrass*, 2020 S.D. 66, ¶¶ 47–50, 951 N.W.2d

792, 806–08 (circuit court did not abuse its discretion when it allowed State's expert to testify about the characteristics of child sex abuse victims); *State v. Edelman*, 1999 S.D. 52, ¶ 23, 593 N.W.2d 419, 423–24 (circuit court did not abuse its discretion when it allowed State's expert to testify "regarding the general characteristics of sexually abused children"); *Guthrie*, 2001 S.D. 61, ¶¶ 37, 42, 627 N.W.2d at 417, 419 (circuit court did not abuse its discretion when it allowed the State's expert to testify about "typical characteristics or profiles of suicidal persons" but that allowing the expert to opine whether a death was not, in fact, a suicide was an abuse of discretion); *State v. Weaver*, 2002 S.D. 76, ¶¶ 21, 28, 648 N.W.2d 355, 364–65, (per curiam) (circuit court did not abuse its discretion when it allowed the State's expert to testify about characteristics associated with domestic abuse, specifically the "cycle of violence" and "battered women's syndrome"); *Johnson*, 2015 S.D. 7, ¶ 34, 860 N.W.2d at 248 (affirming the circuit court's decision that generalized testimony by the State's expert regarding "delayed reporting, 'grooming,' and the psychological effects of sexual abuse" was reliable); *State v. Buchholtz*, 2013 S.D. 96, ¶ 31, 841 N.W.2d 449, 460 ("Experts can fairly testify to what types of behaviors might indicate child sexual abuse, give insights through expert evaluation of a witness, and educate jurors on matters that will help them to assess credibility . . . .").

[¶87.]     The majority opinion declares that the circuit court abused its discretion largely because it concludes that the research relied on by Dr. Manlove is not reliable because it cannot conclusively state whether a given confession is false. But this level of specificity is not necessary to render a scientific method reliable for

*Daubert* purposes. *See Daubert,* 509 U.S. at 590 ("Of course, it would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably, there are no certainties in science.") This is because "[s]cience is not an encyclopedic body of knowledge about the universe. Instead, [science] represents a *process* for proposing and refining theoretical explanations about the world that are subject to further testing and refinement[.]" *Id.* (citation omitted). The relevant question is not whether Dr. Manlove's methodology would *definitively* resolve a factual dispute. Instead, the appropriate inquiry is whether the information he provides would *help* the jury resolve a factual dispute. The circuit court's assessment of Dr. Manlove's qualifications and the reliability of his methods was correctly oriented to the standards set forth in *Daubert*. While our individual assessment of the same evidence may have led us to a different decision, our appellate scope of review allows us to intervene only when there has been an abuse of discretion. In my view, the circuit court's decision does not represent "a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable." *Pretty Weasel,* 2023 S.D. 41, ¶ 28, 994 N.W.2d at 441 (citation omitted).

[¶88.] Regarding Dr. Manlove's testimony about law enforcement interrogation techniques, the circuit court determined that he was qualified to testify as an expert on that topic. At the *Daubert* hearing, Dr. Manlove explained:

| Defense: | All right. That being said, as a broader, I guess, topic, do you receive education and training in interviewing? |
|---|---|
| Dr. Manlove: | Yes. I get lots of education and training in interviewing. |

| | |
|---|---|
| Defense: | And that would - - I mean, at the end of the day, police interrogations, it's simply a law enforcement officer conducting an interview; correct? |
| Dr. Manlove: | Yes, yes. |
| Defense: | So that subject, your knowledge and specialty in interviewing would apply to police or medical or child care workers. It's the same subject; correct? |
| Dr. Manlove: | It's the same subject and it is what forensic psychiatrists do. We interview and we parse out the information we get in the interview and compare it to other stuff. Things I mentioned before like corroborative information, a person's personality style, they're mental health, all those kinds of things. |
| Defense: | And the manner in which an interview is conducted can impact the results. Would that be fair? |
| Dr. Manlove: | Yes. |

In determining that Dr. Manlove's testimony was admissible, the circuit court

explained:

> Dr. Manlove is qualified as an expert in the field of interviewing individuals, and of the different types of interview techniques, including those used by law enforcement (e.g. the Reid Technique). As stated in his testimony, the interview technique(s) used in the interview with [Huante] in this case is a subset/amalgamation of general interview techniques Dr. Manlove is aware of given his education, training, and experience.

[¶89.]    It is unquestionably true that Dr. Manlove's testimony reveals that his

knowledge of specific law enforcement interview techniques is limited. This was

illuminated by the State's cross-examination at the *Daubert* hearing and would

have undoubtedly been drawn to the jury's attention at trial. To qualify as an

expert, one only needs to possess sufficient "scientific, technical, or other specialized

knowledge" so that his testimony would "help the trier of fact to understand the

evidence or to determine a fact in issue[.]" SDCL 19-19-702(a). Any deficiencies in his level of expertise can be adequately "tested through the adversar[ial] process at trial." *Burley*, 2007 S.D. 82, ¶ 24, 737 N.W.2d at 406.

[¶90.]	In my view, the majority opinion requires Huante to satisfy a standard that is more demanding than *Daubert* requires and does not apply the appropriate level of deference required by the abuse of discretion standard of review applicable to this case. I would conclude that the circuit court did not abuse its discretion in concluding that Dr. Manlove could testify as an expert.